## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

MADISON ROLAND individually,
GINA HARRIS as legal guardian to Layla Roland, Joseph Roland, Mason Roland, and
Lily Roland, minor children of and legal heirs to JOSEPH AND JOSSLINE ROLAND;
SAMMI HECKERMAN as personal representative of Decedent, ESTATE OF JOSSLINE
ROLAND and
ROSA BILBREY as personal representative of the ESTATE OF JOSPEH ROLAND.

     Plaintiff(s),

v.

LETGO, INC., a Delaware corporation,
OFFERUP, INC., a Delaware corporation, and
DOES 1-10, whose true name is unknown,

     Defendant(s).

---

## COMPLAINT

---

### I. Nature of the Action.

1. Plaintiffs, by and through counsel hereby brings this Complaint for Damages against LETGO, INC., OFFERUP, INC., and DOES 1-10. The Complaint arises out of Defendants' gross negligence, clear misrepresentations, and deceptive trade practices relating to the use of the marketplace application "Letgo" d/b/a "OfferUp," and resulting in the wrongful death of Joseph and Jossline Roland in Aurora, Colorado, located in the jurisdiction of this court.

2. Plaintiff, Gina Harris, is the legal guardian to the minor children whose biological parents, Joseph and Jossline Roland, residents of Aurora, Colorado, were shot dead on August 14, 2020 — after they were led to believe by the Letgo App that they were buying a listed vehicle for sale by a "verified seller."

3. The two parents-of-five were held at gunpoint, shot, and left to die as the alleged seller took the cash and fled the area. Joseph Roland was an army veteran who was buried at Fort Logan National Cemetery with military honors and his wife Jossline Roland worked as a firm administrator at a Colorado law firm.

4. Letgo enabled the perpetrator, 18-year-old Kyree Brown ("Mr. Brown") – to create a Letgo account under a false name and become a "verified seller," despite his criminal background. Mr. Brown has now been formally charged with two counts of first-degree murder in the brutal deaths of Joseph and Jossline Roland.

5. As more fully described herein, Defendants' wrongful acts and omissions caused the unexpected deaths of Joseph and Jossline Roland and orphaning their five minor children.

6. The foregoing conduct amounts to negligence, gross negligence, misrepresentation, fraud, deceptive and unfair trade practices, loss of consortium, and wrongful death.

7. Since the tragic incident occurred, Letgo has been acquired by OfferUp and thus, Plaintiff seeks damages against Letgo and OfferUp jointly and severally.

## II.  Jurisdiction and Venue.

8. Federal diversity jurisdiction exists pursuant to 28 U.S.C. §1332. Plaintiffs are citizens of Colorado. Defendants are both incorporated in Delaware. Letgo's principal place of business is New York, New York. OfferUp's principal place of business is Bellevue, Washington. Therefore, complete diversity of citizenship exists. The amount in controversy, exclusive of interest and costs, exceeds the sum or value of $75,000.

9. Venue is appropriate in this District because a substantial portion of events giving rise to Plaintiff's claims occurred in this District and Defendants do business in this District.

## III.  Parties.

10. Plaintiff, Madison Roland, is an individual residing in the jurisdiction of this court and is the natural daughter of Decedent Joseph Roland and possesses the legal authority to initiate this action in her individual capacity as the daughter of Mr. Roland.

11. At all relevant times, the minor children of Joseph and Jossline Roland, constituting Layla, Joseph, Mason, and Lily ("Minor Children"), were individuals residing in the jurisdiction of this court and are the natural children of Decedents Joseph and Jossline Roland ("the Roland's").

12. Plaintiff, Gina Harris, was appointed as guardian and conservator of the Roland's' minor Children after their death pursuant to an order of guardianship and conservatorship in the probate court with the Arapahoe County District Court in the State of Colorado. As the minor children's legal guardian, Plaintiff possesses the legal authority to initiate this action on behalf of the Minor Children.

13. Plaintiff, Sammy Heckerman, is the personal representative of the Estate of Jossline Roland, pursuant to the probate court for Arapahoe County District Court.

14. Plaintiff, Rosa Bilbrey, is the personal representative of the Estate of Joseph Roland, pursuant to the probate court for Arapahoe County District Court.

15. These parties each possess the legal authority to initiate this action individually and/or on behalf of the Decedents, their Minor Children and beneficiaries of the Estates and are the proper parties to bring this action.

16. At all relevant times, Letgo ("LETGO") was and is a corporation organized and existing under the laws of the State of Delaware. Letgo may be served with process at their prinipcal business address: 175 Varick Street 1st Floor New York, New York 10014. Letgo is authorized to conduct and transact business in the jurisdiction of this court and does in fact regularly conduct and transact business in the jurisdiction of this court. Letgo's decisions and/or lack of decisions in Colorado have caused the underlying events in this lawsuit.

17. At all relevant times, OfferUp, Inc. ("OFFERUP") was and is a corporation organized and existing under the laws of the State of Delaware. OfferUp may be served with process at their principal business address: 1745 114th Avenue SE, Bellevue, WA 98004. OfferUp is authorized to conduct and transact business in the jurisdiction of this court and does in fact regularly conduct and transact business in the jurisdiction of this court. OfferUp's decisions and/or lack of decisions in Colorado have caused the underlying events in this lawsuit.

18. Defendant DOES 1 through 10, are, and at all relevant times were, individuals residing in the jurisdiction of this court.

19. The true names and capacities, whether individual, entity, associate or otherwise sued herein as DOES 1 THROUGH 10, inclusive, are unknown to Plaintiffs at the time of filing this Complaint, who therefore sue said Defendants by such fictitious names.

20. Plaintiffs will ask leave of court to amend this Complaint to show the true names and capacities of such Defendants when the same area ascertained. Plaintiffs are informed and believe, and thereupon allege, that each of the Defendants designated herein, including DOES 1 THROUGH 10, are responsible in some manner for the happenings and occurrences hereinafter alleged, and that such conduct was a substantial factor in causing the injuries to Plaintiff complained herein.

## IV. Factual Allegations.

### A. An Overview of Letgo and OfferUP

21. Letgo is a company that provides a website and mobile application that allows users to "buy from, sell to and chat with others locally."

22. Letgo was founded by Alec Oxenford in January 2015. Letgo initially targeted the United States market and competed against online marketplace leaders such as eBay and Craigslist. As of 2018, the company valuation was more than $1 billion and has continued to grow astronomically.

23. Letgo distinguishes itself from its competitors by advertising its "verified user" feature. The purpose of this feature is to reassure its consumers that the buyers and sellers with this "verified user" tag are reputable. On its website, Letgo even explains that it utilizes "machine learning" to identify and block inappropriate content (such as stolen merchandise) and continues to work closely with local law enforcement to ensure the "trust and safety of the tens of millions of people who use Letgo."

24. OfferUp is a mobile-driven "consumer to consumer" marketplace with an emphasis on in-person transactions. Offerup separates itself, from its competitors, by its mobile-friendly apps and user profiles with ratings.

25. The Offerup application was founded in 2011 by Nick Huzar and Arean van Veelen as a direct competitor to Craigslist. OfferUp is currently one of the largest marketplaces in the United States with more than 20 million monthly active users and over 90 million app downloads. In October 2021, OfferUp had become the top-grossing iPhone shopping app in the Apple App Store in the United States.[1] OfferUp characterizes itself to be "the simplest, most trusted way to buy and sell locally."[2]

26. On or around March 26, 2020, OfferUp raised $120 million in new funding and acquired Letgo for an undisclosed amount. Subsequently, the Letgo App in the United States merged into the OfferUp App on or around August 31, 2020. Offerup advertised the merger as an opportunity to "combine the strengths of both marketplaces to create a bigger and better experience for buyers and sellers." The Letgo App still independently exists outside of the United States.

27. Prior to its acquisition by Offerup, Letgo required a consumer to create a Letgo account in order to access its "marketplace." All Letgo required for a new account was an unverified name and an active email address — nothing else.

---

[1] *See* "Leading iPhone shopping apps in the U.S. 2021, by revenue": https://www.statista.com/statistics/242489/top-iphone-shopping-apps-usa-by-revenue/
[2] *See* "About OfferUp": https://about.offerup.com/

28.Once a new Letgo account is created, each Letgo user is given an individual "user profile". Each new member is then given an opportunity and even encouraged to "verify" their "user profile."

29. However, Letgo allowed users to become "verified" by simply providing an unverified name along with unverified contact information (**or** by linking a Google or Facebook account). Once a user is "verified", you will see "VERIFIED WITH" on their profile (along with the method they chose). Yet, there is no background check or other verification process to ensure the user is who they hold themselves out to be. As will be detailed herein, despite its advertising and marketing, Letgo does not actually have a verification process to authenticate a new user's identification other than absolute trust in the user creating the profile.

30. Again, Letgo distinguished itself from its direct competitors through this "verified user" feature. However, all that is required to become "verified" is to provide a functioning e-mail address and a name — the same as its competitions such as Craigslist.

31.Once created, a Letgo user's account profile is viewable and accessible by any other Letgo user. Letgo buyers and sellers are then encouraged to connect with other users solely through its app. The purpose of solely relying upon the app is to prevent any personal information, such as email addresses or phone numbers, to be exchanged between users. Consequently, this forces Letgo users to rely entirely upon the app's alleged safety and verification features — an unverified identity and an active e-mail address — to connect with other users of Letgo.

32. Additionally, based on its own advertising and marketing, selling stolen merchandise is allegedly prohibited on its app. Letgo even advertises its apparent collaborative effort with law enforcement to remove these items. Furthermore, the app promotes its "anti-fraud technology" to help detect signs of possible scams based on keyword usage.[3]

33. Despite Letgo's representations that Letgo is a safe and trusted marketplace for its users, the facts herein demonstrate otherwise.

## B.  The Murders of Joseph and Jossline Roland

34. Plaintiffs realleges and incorporates by reference each and every previous allegation as though fully set forth herein.

35. In August 2020, Joseph Roland ("Mr. Roland"), the father of five minor children and an army veteran, initiated the process of searching for a used vehicle for his eldest daughter to drive.

---

[3] *See* https://fortune.com/2016/09/08/offerup-unicorn/

36. During his search, Mr. Roland utilized the Letgo app and its "verified" seller feature. On or around August 14, 2020, Mr. Roland discovered the posting of a "2017 Toyota Rav 4 LE AWD" for $5,000.00 by James Worthy, one of Letgo's "verified" sellers. As law enforcement later discovered, James Worthy was just a pseudonym for 18-year-old Kyree Brown ("Mr. Brown").

37. Mr. Roland relied upon the "verified seller" tag before legitimately pursuing the sale of the vehicle. As previously mentioned, Letgo specifically uses the "verified seller" feature to distinguish itself from its direct competitors such as Craigslist. As such, Mr. Roland relied upon Letgo's misrepresentations concerning its verification process before initiating contact with the actual seller, Mr. Brown.

38. As recommended, Mr. Roland and Mr. Brown only exchanged messages via the Letgo chat feature. Trusting the verification process represented by Letgo, Mr. Roland ultimately decided to meet Mr. Brown on the evening of August 14, 2020 and complete the purchase. Mr. Roland and Mr. Brown agreed to meet at a PETCO parking lot by the Southlands Mall, a public shopping area with good lighting in the District of Colorado.

39. On the evening of August 14, 2020 at approximately 11 p.m., Mr. Roland and his wife Jossline Roland left their residence, for what would end up being the last time. Mrs. Roland accompanied her husband so she could drive the 2017 Toyota Rav 4 back to their residence following the purchase. What was supposed to be a brief and safe transaction through Letgo — turned into a tragic nightmare.

40. Upon arrival, Mr. Brown notified the Roland's that he accidentally brought the wrong vehicle title to the PETCO shopping center. To rectify the matter, Mr. Brown suggested the Roland's follow him back to his fictitious residence in the 11000 block of East Cornell Circle to obtain the correct title, also located in the District of Colorado. Unsuspecting of any danger, since James Worthy was a Letgo "verified seller," the Roland's obliged and followed Mr. Brown back to "his residence".

41. As both vehicles arrived at the fictitious residence, Mr. Brown stepped out of the Toyota Rav 4 and approached the driver's side window of the Roland's white Honda Pilot. Mr. Brown then promptly held the two parents-of-five at gunpoint, with his 9mm handgun, and demanded the money.

42. Mr. Roland attempted to grab Mr. Brown's gun with no success. At this point, Mr. Brown intended to shoot Mr. Roland, but accidentally struck and killed Mrs. Roland. Mr. Brown then discharged his firearm again and successfully struck Mr. Roland.

43. With both Mr. and Mrs. Roland inside their vehicle and finally motionless, Letgo's "verified seller" purposefully reached into the Roland's vehicle and grabbed an envelope containing $3,000.00 in cash before fleeing the scene — leaving the Roland for dead.

6

44. At approximately 11:30 p.m. on August 14, 2020, nearby residents heard between five to six gunshots and immediately called 911 to report the shooting. Upon arrival, law enforcement found both Mr. and Mrs. Roland unresponsive in their vehicle and immediately transported them to the nearest hospital. Despite their quick response time, both Joseph and Jossline Roland were declared dead slightly after midnight on August 15, 2020 — leaving behind their five minor children.

45. Soon after, Aurora Police Department commenced its investigation.

## C. The Investigation of Aurora Police Department

46. On August 14, 2020 at approximately 11:49 p.m., the Aurora Public Safety Communications (Dispatch Center) received a 911 call reporting of a shooting with two victims near 11763 East Cornell Circle in Aurora, CO.

47. Officers with the Aurora Police Department ("APD") were immediately dispatched and observed the lifeless bodies of Joseph and Jossline Roland ("The Roland's") inside their 2012 Honda Pilot.

48. The Roland's both suffered gunshot wounds and were medically tended to on scene by members of the Aurora Fire Department and transported to The Medical Center of Aurora.

49. Joseph Roland was pronounced dead at approximately 12:24 a.m. on August 15, 2020.

50. Jossline Roland was pronounced dead at approximately 12:29 a.m. on August 15, 2020.

51. Upon arrival, APD secured the scene and immediately began to canvass the community for additional evidence and witnesses. Through its investigation, APD discovered surveillance footage from a nearby residence. Upon review, the police were able to confirm the Roland's white Honda Pilot as it approached a dark colored SUV (the 2017 Toyota Rav 4). APD then observed Mr. Brown exit the 2017 Toyota Rav 4 and approach the Roland's Honda Pilot before he discharged his 9mm handgun five times. All five rounds were audible in the obtained surveillance footage.

52. Following its search of the crime scene, APD made contact with the Roland residence. During its investigation, APD discovered that the Roland's 17-year old daughter was the oldest individual living at the residence along with four other minor children. Through this follow-up, APD was able to legally gain access to Mr. Roland's iPhone and review communications between Mr. Roland and Mr. Brown via the Letgo app.

53. Upon review of Mr. Roland's iPhone, APD accessed the Letgo app and located a post of a 2017 Toyota Rav 4 for sale by a "James Worthy" that Mr. Roland had recently viewed. The Letgo app also showed that the "James Worthy" account was "verified"; yet lacked any credible information to actually locate the person behind the "James Worthy" account. Despite actively pursuing the double homicide by law enforcement, Letgo's lack of verification caused further delay in uncovering the true identity of "James Worthy."

54. This delay, caused by Letgo, allowed Mr. Brown to tamper/destroy evidence. Mr. Brown set the 2017 Toyota Rav 4 on fire; deleted his fictitious "James Worthy" account (with no credible information); and created an entirely new fictitious account with the same 2017 Toyota Rav 4 that Mr. Brown had just destroyed.

55. Based upon Letgo's failure to implement an actual verification process, Mr. Brown was not only able to create a fictitious account; but to even sell a stolen vehicle.

56. The 2017 Toyota Rav 4 Mr. Brown used to lure the Roland's to their deaths was reported stolen on August 9, 2020 in Denver, Colorado. Letgo feverishly advertises its prohibition on the sale of stolen merchandise, yet Mr. Brown successfully advertised stolen property.

57. On August 19, 2020, five days after the Roland's were murdered, Mr. Brown deleted his "James Worthy" profile and immediately created another "verified" account under a new pseudonym: "Jessica Harlan." In other words, Letgo allowed for Mr. Brown to create a new "verified" account under a different false name with the same stolen vehicle.

58. On August 20, 2020, a search warrant for Letgo account information also proved to be futile. The search warrant forced Letgo to provide all information for the "James Worthy" and "Jessica Harlan" accounts. The information showed nothing but an e-mail address. In fact, the criminal affidavit from the Aurora Police Department notes that the account holder had **no contact information** other than an e-mail address. In other words, a "verified seller" just needs a valid e-mail address — nothing else.

59. The Letgo App provides an illusion that these alleged "verified" accounts can and should be trusted above their online "marketplace" competition. However, it has become increasingly clear that Letgo falsely advertises itself as a safe online marketplace for verified sellers without having any sort of legitimate verification process.

60. Letgo's practices (or lack of) forced law enforcement into filing an emergency order with Verizon Wireless; just to obtain basic information on a murderer who carried out a double homicide through the Letgo App. Once obtained, investigators were then able to access, from Verizon Wireless, an emergency ping of the phone number associated with the account and immediately tracked its location.

61. On August 27, 2020, **12 days after a double homicide**, Verizon Wireless confirmed location data of the phone used at Southlands Mall at the time of the "vehicle sale" on August 14, 2020; the location of the murders at the remote apartment complex; and the final location of the vehicle's abandonment and simultaneous destruction.

62. As previously stated, Letgo's lack of verification practices delayed investigators' ability to locate and eventually arrest Mr. Brown.

63. However, a same-day arrest was made once law enforcement received the call detail records from Verizon Wireless on August 27, 2020.

64. Once law enforcement captured Mr. Brown, he quickly confessed to the murders of Joseph and Jossline Roland and was found in possession of the stolen $3,000.

65. Plaintiffs seeks to hold Letgo accountable for its fraudulent advertising and deceptive trade practices in connection with its sham verification process, which directly led to the tragic deaths of two loving parents of five minor children.

66. As a consequence of Defendants' grossly negligent acts, Plaintiffs have been damaged in an amount to be determined at trial. Plaintiffs allege that each is entitled to relief to the full extent provided under law and equity, inclusive of an award of attorney's fees.

## V. Claims for Relief.

COUNT ONE: NEGLIGENCE (Against All Defendants)

67. Plaintiffs reallege and incorporates by reference each and every previous allegation as though fully set forth herein.

68. Plaintiffs brings this claim for relief individually, and/or in capacity as guardian of the Minor Children of the Roland's and/or Personal Representative of the Estates of the Roland's.

69. The foregoing claim for relief arose in Decedent's favor, and Decedents would have been the plaintiff with respect to this claim for relief had they lived.

70. Defendants constructed a website and mobile application that allows individuals to create accounts to buy and/or sell products in the marketplace. Defendants actively encourage users of Letgo to look for "verification badges" on user profiles, indicating those users can be trusted.

71. Defendants expressly and implicitly represented that their application was safe, especially when dealing with "verified sellers;" but Defendants had actual and constructive knowledge that they had no meaningful security measures or policies in

place to effectively safeguard Letgo buyers from being murdered by anonymous Letgo sellers.

72. Defendants, and each of them, had a duty to exercise reasonable care in the marketing, advertising, promoting, sale, and/or distribution of the Letgo app into the stream of commerce, including but not limited to: (1) a duty to assure that the identity of sellers on the marketplace application were not false; (2) a duty to ensure all products listed on the application were legitimate and not the result of any illegal activity; (3) a duty to vet individuals who attempt to become 'verified sellers' on the application; and (4) a duty to assure that executing a purchase using the application would not create an unreasonable risk of injury or damage to its customers' lives or property.

73. Defendants, and each of them, breached their duty by publicly touting the effectiveness of their security measures and policies of their verification process that Defendants knew or should have known were utterly non-existent and ineffective in deterring the likelihood of danger and harm to Plaintiffs. Further, Defendants knew or should have known that using Letgo created a high risk of unreasonable and dangerous safety issues, including but not limited to, purchasing products acquired through illegal activity, confronting alleged 'verified sellers' who, in reality, use false identities and have criminal backgrounds, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life.

74. The negligence by Defendants, and each of them, included but was not limited to the following acts and/or omissions:

   a. Negligently representing that Letgo was safe for use for its intended purpose, and/or that Letgo was safer than its competitors such as Craigslist due to the 'verified seller' feature;

   b. Negligently representing that products posted for sale in the marketplace are not illegally obtained, stolen, or related to any crime; and

   c.  Negligently representing that "verified users" could be trusted when in fact, there is no real verification process at all.

75. Defendants willfully, wantonly, and negligently induced the Roland's to believe Mr. Brown's "James Worthy" account had been verified and therefore, could be trusted. Defendants' false representations gave the sense of security when no such security exists.

76. The brutal double homicide of the Roland's was, at a minimum, reasonably foreseeable and could have been prevented had Letgo not misrepresented the safety of its "verified sellers" feature.

77. As a direct and proximate result of the foregoing wrongful acts and omissions of Defendants, and each of them, the Decedents sustained general damages, including pain and suffering, and a loss of enjoyment of life and other hedonic damages, the exact amount of which to be determined according to proof at time of trial.

78. By reason of the aforementioned acts and omissions of Defendants, and each of them, Plaintiffs have suffered loss of love, companionship, affection, comfort, care, society, and she will continue to be so deprived for the remainder of her life.

79. In acting as alleged herein, Defendants, and each of them, caused the Roland's demise and the resulting loss to Plaintiffs, thereby causing Plaintiffs to be damaged in an amount to be proven at the time of trial.

COUNT TWO: GROSS NEGLIGENCE (Against All Defendants)

80. Plaintiffs realleges and incorporates by reference each and every previous allegation as though fully set forth herein.

81. Defendants knowingly and purposely ignored the safety of Letgo users in exchange for wrongfully ensuring its marketplace application was safer and had more credible users than its competitors, thereby fueling its growth and profit.

82. Defendants' acts and omissions, when viewed objectively from their standpoint, during the relevant time, involved an extreme degree of risk and callousness. Particularly in light of:

   a. Defendants' actual knowledge, awareness, and conscious indifference of the extreme dangers Letgo posed to Letgo users who deal with 'verified users';

   b. Defendants' actual knowledge, awareness, and conscious indifference that Letgo users were able to easily post for sale stolen products, like the vehicle posted by Mr. Brown, thereby aiding its users in carrying out unlawful activity;

   c. Defendants' actual knowledge, awareness, and conscious indifference to the misrepresentations they made to the Roland's and the public at large regarding the safety and security of Letgo for Letgo users, especially in relation to its verified users'; and

   d. Defendants' actual knowledge, awareness, and conscious indifference to not institute even the most minimal security measures that would have greatly increased the safety of Letgo users, like the Roland's, from being brutally murdered.

83. Defendants knew there was a substantial likelihood of serious injury and harm to Letgo users, particularly the Roland's, who relied on Letgo's purported

"verification" of its sellers. Moreover, it is outrageous conduct that Letgo led customers to believe the App had any legitimate verification process when, any user, (let alone Mr. Brown – who had a criminal record), could use fictitious names and sell stolen vehicles as "verified" by simply providing an e-mail address.

84. Defendants' acts and omissions demonstrate a conscious indifference and utter disregard for the rights, safety, and welfare of Letgo users, specifically the Decedents.

85. As a direct and proximate result of the foregoing wrongful acts of Defendants, and each of them, the Decedents sustained general damages, including pain and suffering, and a loss of enjoyment of life and other hedonic damages, the exact amount of which to be determined according to proof at time of trial.

86. By reason of the aforementioned acts and omissions of Defendants, and each of them, Plaintiffs have suffered loss of love, companionship, affection, comfort, care, society, and she will continue to be so deprived for the remainder of her life.

87. As a result of the foregoing wrongful acts and omissions of Defendants, and each of them, as alleged herein, Plaintiffs sustained general damages, including grief, emotional distress and pain and suffering and loss of comfort and society, and special damages, including loss of support, in an amount in accordance with proof.

88. In doing the foregoing wrongful acts and omissions, Defendants, and each of them, acted in reckless disregard for the rights of Plaintiffs, on behalf of the Minor Children and personal representative of the Roland's, when they unreasonably misrepresented trust and safety in the decedents that was relied upon. The wrongful acts, and each of them, were willful, oppressive, and malicious, thus warranting the award of punitive damages against Defendants for gross negligence in an amount adequate to punish the wrongdoers and deter future misconduct.

## COUNT THREE: FRAUD (Against All Defendants)

89. Plaintiffs reallege and incorporates by reference each and every previous allegation as though fully set forth herein.

90. At all relevant times hereto, Defendants, and each of them, conducted a intense marketing campaign to promote the use of the Letgo marketplace application and willfully deceive the Roland's and the general public as to the benefits, risks, and consequences of using Letgo and more specifically, transacting with a "verified seller."

91. Defendants made express and implied representations to Plaintiffs, both directly and indirectly. Defendants posted express representations on Letgo and made numerous material and false express and implied representations to the public, including the Roland's, that Letgo was safe for Letgo users. In fact, Defendants

encouraged Letgo users to trust its "verified sellers" even though Defendants knew all that is required to be "verified" under its policies is a functioning email address. Defendants induced Letgo users to believe a verification process is undertaken. These material and false representations were untrue, deceptive, and misleading.

92. Defendants made these material and false representations knowing they were false and/or made them recklessly without knowledge of their trust and as a positive assertion of fact.

93. Defendants made these material and false representations with the intent that Plaintiffs rely upon them and with the expectation that Plaintiffs would act in reliance on them.

94. Defendants knew of Letgo's material and false representations, Plaintiffs relied upon them, and Plaintiffs' reliance was justifiable.

95. Defendants' material and false representations were the direct and proximate cause of Plaintiff's injuries.

96. As a direct and proximate result of the foregoing wrongful acts of Defendants, and each of them, the Decedents sustained general damages, including pain and suffering, and a loss of enjoyment of life and other hedonic damages, the exact amount of which to be determined according to proof at time of trial.

97. By reason of the aforementioned acts and omissions of Defendants, and each of them, Plaintiffs have suffered loss of love, companionship, affection, comfort, care, society, and she will continue to be so deprived for the remainder of her life.

98. In acting as alleged herein, Defendants, and each of them, caused Mr. and Mrs. Roland's demise and the resulting loss to Plaintiffs, thereby causing Plaintiffs to be damaged in an amount to be proven at the time of trial.

99. Moreover, Plaintiffs seek actual, direct, consequential, and exemplary damages against Defendants, and each of them, for fraud.

COUNT FOUR: NEGLIGENT MISREPRESENTATION (Against All Defendants)

100. Plaintiffs realleges and incorporates by reference each and every previous allegation as though fully set forth herein.

101. Defendants made express and implied representations to the Roland's in the course of Letgo's business and/or during transactions in which Defendants had an interest. Defendants knew or should have known that the Roland's, as its customers, were members of the class of persons that would receive their false and material representations. These false and material representations included misstatements of

13

material facts and were made in regard to the security and safety of Letgo for Letgo users.

102. Defendants supplied this false information for the guidance of others and the Roland's in their business to turn a profit.

103. Defendants did not exercise reasonable care or competence in obtaining and/or communicating information regarding the safety and security of Letgo for Letgo users.

104. The Roland's justifiably relied on Defendants' negligent misrepresentations and consequently, the Roland's use of the Letgo App was to their detriment. Defendants' negligent misrepresentations were the proximate cause of the Roland's ultimate deaths.

105. As a direct and proximate result of the foregoing wrongful acts of Defendants, and each of them, the Decedents sustained general damages, including pain and suffering, and a loss of enjoyment of life and other hedonic damages, the exact amount of which to be determined according to proof at time of trial.

106. By reason of the aforementioned acts and omissions of Defendants, and each of them, Plaintiffs have suffered loss of love, companionship, affection, comfort, care, society, and she will continue to be so deprived for the remainder of her life.

107. In acting as alleged herein, Defendants, and each of them, caused Mr. and Mrs. Roland's demise and the resulting loss to Plaintiffs, thereby causing Plaintiffs to be damaged in an amount to be proven at the time of trial.

COUNT FIVE: DECEPTIVE AND UNFAIR TRADE PRACTICES VIOLATION OF C.R.S. §6-1-101 *et seq.* (Against All Defendants)

108. Plaintiffs realleges and incorporates by reference each and every previous allegation as though fully set forth herein.

109. Defendants, by its wrongful acts and omissions as set forth herein, engaged in deceptive trade practices, which said deceptive trade practices occurred in the course of Defendants' business, including, without limitation, failing to disclose material information concerning the verification process of Letgo's users, which such information was known at the time of repeated advertisements and/or sales intending to induce the consumer to enter into a transaction via the Letgo App, thereby turning a profit. Defendants knowingly made false representations as to the safety and security of the Letgo App and its alleged 'verified sellers' to gain more credibility than their competitors sellers.

110. Said deceptive trade practices significantly impacted the public as actual or potential consumers of the Defendants' product, a mobile marketplace application.

111. The Roland's were actual consumers of the Defendants' product and are now deceased as a result of Defendants' deceptive trade practices.

112. Defendants' deceptive trade practices were a direct and proximate cause of the unexpected deaths of the Roland's.

113. Were it not for Defendants' unlawful conduct, the Roland's would not have communicated with Mr. Brown and/or attempted to buy a vehicle from Mr. Brown via Letgo. Instead, the Roland's would have utilized a safe and reliable marketplace application fit and safe for its intended purpose.

114. Defendants' acts and omissions were done in bad faith, and were willful, knowing, and intentional, and were a cause of Plaintiffs' injuries, damages, and losses.

115. As a direct and proximate result of the foregoing wrongful acts of Defendants, and each of them, the Decedents sustained general damages, including pain and suffering, and a loss of enjoyment of life and other hedonic damages, the exact amount of which to be determined according to proof at time of trial.

116. By reason of the aforementioned acts and omissions of Defendants, and each of them, Plaintiffs have suffered loss of love, companionship, affection, comfort, care, society, and she will continue to be so deprived for the remainder of her life.

117. In acting as alleged herein, Defendants, and each of them, caused Mr. and Mrs. Roland's demise and the resulting loss to Plaintiffs, thereby causing Plaintiffs to be damaged in an amount to be proven at the time of trial.

COUNT SIX: LOSS OF CONSORTIUM (Against All Defendants)

118. Plaintiffs realleges and incorporates by reference each and every previous allegation as though fully set forth herein.

119. At all relevant times, Plaintiffs maintained a familial relationship with the Mr. and Mrs. Roland, depending upon them for emotional guidance, care, compassion, companionship, and financial support.

120. As a result of the wrongful and/or negligent acts and omissions of Defendants, consortium Plaintiffs were caused to suffer and will continue to suffer, the loss of love, companionship, compassion, care, comfort, affection, moral support, protection and consortium of her mother and father.

121. This loss of consortium was directly and proximately caused by the actions and inactions of Defendants and its products.

122. As a direct and proximate result of the foregoing wrongful acts and omissions of Defendants, and each of them, as herein alleged, Plaintiffs, as guardian to Minor Children and personal representative of the Decedents, Joseph and Jossline Roland, sustained general and compensatory damages, including pain and suffering, and a loss of the enjoyment of life and other hedonic damages, the exact amount of which to be determined according to proof at time of trial.

123. By reason of the foregoing, Plaintiffs have been damaged by Defendants' wrongful conduct. Defendants' conduct was willful, wanton, reckless and, at the very least, arose to the level of gross negligence so as to indicate a complete disregard of the rights and safety of the users of the Letgo App and other consumers, justifying an award of punitive damages.

COUNT SEVEN: WRONGFUL DEATH (Against All Defendants)

124. Plaintiffs realleges and incorporates by reference each and every previous allegation as though fully set forth herein.

125. That as a direct and proximate result of the collective acts and omissions as stated above; Joseph and Jossline Roland died on August 15, 2020. Mr. and Mrs. Roland's deaths were the result of the wrongful acts and omissions by the Defendants, as alleged herein and were the proximate cause of their deaths.

126. Accordingly, Plaintiff asserts wrongful death actions against all Defendants pursuant to Colorado Revised Statutes §§ 13-21-201 *et seq.,* known as the Colorado Wrongful Death Act. This claim is based upon the fact that Defendants' negligent, reckless, and wrongful acts and omissions, as alleged herein, were a direct and legal cause of Mr. and Mrs. Roland's deaths and the resulting damages to Plaintiff. As a result of their conduct, Defendants are liable for Plaintiffs' injuries, either because they were integral participants in the wrongful conduct, or because they failed to intervene to prevent these violations.

127. Plaintiffs are informed and believes and thereon alleges that the acts of Defendants, and each of them, were willful, malicious, intentional, oppressive, reckless and/or were done in willful and conscious disregard of Plaintiffs' rights, welfare, and safety and those of her mother and father, decedents Mr. and Mrs. Roland, justifying the awarding of punitive and exemplary damages in an amount to be determined at time of trial.

128. That as a direct and proximate result of the wrongful deaths of Joseph and Jossline Roland, Plaintiffs as legal guardian of the Minor Children and heirs of the Rolands, claims damages and prays for an amount in excess of the minimum federal

jurisdictional limits which at this time are Seventy-Five Thousand Dollars, $75,000.00,
exclusive of interest and cost. Such injuries and damages include but are not limited to:

    a. for the loss of life of Joseph and Jossline Roland;

    b. for the funeral expenses of Joseph and Jossline Roland;

    c. for the conscious pain, suffering and mental anguish of Joseph and
    Jossline Roland prior to their death;

    d. for medical expenses attributed to the fatal injury of Joseph and Jossline
    Roland; and

    e. for the mental anguish and grief of Madison Roland, daughter of
    Joseph Roland.

    f. for the mental anguish and grief of the Roland's four other minor
    children.

## VI.  Prayer for Relief.

WHEREFORE, Plaintiffs, in their individual capacity, and/or as legal guardian to
Minor Children and/or as personal representatives of the decedents, Joseph and
Jossline Roland, hereby prays for relief as follows:

1. For general and compensatory damages in an amount to be proven at trial;
2. For punitive and exemplary damages in an amount to be determined at trial;
3. For costs, interests and attorneys' fees incurred herein; and
4. For such other and further relief as this court may deem just and proper, including injunctive and declaratory relief.

Respectfully submitted this 14th day of April, 2022

s/ Nathan T. Mattison
*Nathan T. Mattison*
Law Offices of Dianne Sawaya, LLC
4500 Cherry Creek Drive South, Suite 1030
Denver, CO 80246
Telephone: (303) 758-4777
E-mail: nmattison@dlslawfirm.com
*Local Counsel for Plaintiffs*

## GERAGOS & GERAGOS, APC
Ben Meiselas
Daniel Tapetillo
Historic Engine Co. No. 28
644 South Figueroa Street
Los Angeles, California 90017-3411
Telephone: (213)625-3900
*Pro Hac Vice Admission Pending*