IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 22-cv-00899-MEH

MADISON ROLAND, individually,
GINA HARRIS, as legal guardian to Layla Roland, Joseph Roland, Mason Roland, and Lily
Roland, minor children of and legal heirs to Joseph and Jossline Roland,
SAMMI HECKERMAN, as personal representative of Decedent, Estate of Jossline Roland, and
ROSA BILBREY, as personal representative of the Estate of Joseph Roland,

      Plaintiffs,

v.

LETGO, INC.,
OFFERUP, INC., and
DOES 1-10,

      Defendants.

_____

## ORDER
_____

**Michael E. Hegarty, United States Magistrate Judge**.

Plaintiffs assert seven claims against the Defendants Letgo, Inc. ("Letgo") and OfferUp,

Inc. ("OfferUp") (collectively "Defendants") arising from the Roland children's loss of their

parents in a vicious crime. Amended Complaint, ECF 4. Defendants have filed a Motion to Dismiss

Under Fed. R. Civ. P. 12(b)(6). ECF 20. The matter is fully briefed, and the parties presented oral

argument on October 31, 2022. For the reasons forth below, the Motion is granted.

## BACKGROUND

The circumstances giving rise to this case are shocking and heartbreaking. A man named

Kyree Brown posted an advertisement to sell a car through the online marketplace Letgo. Joseph

and Jossline Roland, parents of five minor children, were looking for a car for their eldest daughter.

Brown created a user profile on Letgo using the fictitious name James Worthy. The car he was

offering for sale was in fact stolen. The Rolands answered Brown's ad and arranged to meet him late at night at a well-lighted shopping center. When the Rolands arrived, Brown told them he brought the wrong car title and asked them to follow him to his dwelling to obtain the correct title. The Rolands did so and traveled to an apartment complex. Upon arrival, Brown got out of the car and, at gunpoint, attempted to rob the Rolands of the money they had brought for the transaction. Mr. Roland attempted to disarm Brown. Brown murdered the Rolands. He was apprehended several days later and pleaded guilty to the murders.

Plaintiffs, the heirs of the Rolands, bring this lawsuit against Letgo and its subsequent purchaser, OfferUp, claiming that the companies misled Letgo patrons by "verifying" the identity of people posting ads on Letgo have had their identity "verified." Plaintiffs allege that this objectively signaled that the advertiser was a known person who was sincerely trying to sell something. Plaintiffs' claims include negligence, gross negligence, fraud, negligent misrepresentation, wrongful trade practices under Colorado Consumer Protections Act (CCPA), Colo. Rev. Stat. § 6-1-101, loss of consortium, and wrongful death.

Defendants' Motion raises immunity under the Communications Decency Act of 1996 (CDA), 47 U.SC. § 230, and failure to state a claim.

## <u>FACTUAL ALLEGATIONS</u>

The following are material, factual allegations (as opposed to legal conclusions, bare assertions, or conclusory allegations) made by Plaintiffs in their Amended Complaint, which are taken as true for analysis under Fed. R. Civ. P. 12(b)(6) pursuant to *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Letgo provides a website and mobile application allowing users to "buy from, sell to and chat with others locally." Amended Complaint ("Am. Compl.") at ¶ 21. It advertises a "verified

user" feature. *Id.* ¶ 23. On its website, Letgo explains that it utilizes "machine learning" to identify and block inappropriate content (such as stolen merchandise) and continues to work closely with local law enforcement to ensure the "trust and safety of the tens of millions of people who use Letgo." *Id.* OfferUp merged with Letgo on or around August 31, 2020. *Id.* ¶ 26.

To access its "marketplace," Letgo requires that its consumers create a Letgo account. *Id.* ¶ 27. Each new account must provide a name (the truthfulness of which Letgo does not verify) and an active email address. *Id.* Once a new Letgo account is created, the user is given an individual "user profile." *Id.* at ¶ 28. Each new user is then given an opportunity to and is encouraged to "verify" their "user profile." *Id.* Once a user is "verified," the term "VERIFIED WITH" appears on their profile (in this case, Brown verified with a functioning email address). *Id.* ¶¶ 29-30.[1] Letgo performs no background check or other verification process. *Id.* Once created, a Letgo user's account profile is viewable and accessible to any other Letgo user. *Id.* ¶ 31. Letgo buyers and sellers are then encouraged to connect with other users solely through Letgo's app. *Id.* Letgo's advertising and marketing policies prohibit selling stolen merchandise. *Id.* 32. Furthermore, the app promotes its "anti-fraud technology" to help detect signs of possible scams based on keyword usage. *Id.*

Here, Brown created a profile with the fictious name "James Worthy." *Id.* ¶ 36. Mr. Roland used Letgo to find Brown's alleged 2017 Toyota Rav 4 LE AWD for sale. *Id.* ¶¶ 36-37. The advertised car had been stolen on August 9, 2020. *Id.* ¶ 56. On August 14, 2020, Brown and Mr. Roland exchanged messages via the Letgo chat function. *Id.* ¶ 38. They agreed to meet that evening

---

[1] Contrary to the Amended Complaint, Defendants provide an actual screen shot from Brown's ad, which shows that the account was verified with a telephone number. I do not believe this distinction is material. In addition, the screen shot notes that Letgo advised users such as the Rolands to "[a]sk them (*i.e.*, sellers of items) to verify their profile." Mot. at 5.

at a PETCO parking lot by the Southlands Mall in metropolitan Denver. *Id.* Mr. and Mrs. Roland drove to the agreed location together, intending that Mrs. Roland drive the newly purchased car home. *Id.* ¶ 39. Upon arrival, Brown told the Rolands that he accidentally brought the wrong vehicle title to the PETCO shopping center and asked them to follow him to his fictitious residence in the 11000 block of East Cornell Circle to obtain the correct title. *Id.* ¶ 40. The Rolands did so. *Id.* As both vehicles arrived at that address, Brown stepped out of the Rav 4, approached the driver's side window of the Rolands' vehicle, pulled out a weapon, and demanded their money. *Id.* ¶ 41. Mr. Roland attempted to grab Mr. Brown's gun. *Id.* ¶ 42. Brown errantly shot Mrs. Roland, and then Brown deliberately and in cold blood shot Mr. Roland. *Id.* He reached into the Rolands' vehicle, stole their money, and fled the scene. *Id.* ¶¶ 41-43. The Rolands were declared deceased at the hospital. *Id.* ¶ 44. Brown was arrested on August 27, 2020. *Id.* ¶ 63. "On August 31, [2022] a jury found Kyree Brown, 20, guilty of killing Joe and Jossline Roland." Press Release, 18th Judicial District, Man convicted of killing Aurora couple who responded to online car advertisement (September 1, 2022), https://www.da18.org/2022/09/8426/. The conviction included two counts of first-degree felony murder. *Id.*

## LEGAL STANDARD

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the plaintiff's complaint. *Sutton v. Utah State Sch. For the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 2008). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pled facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires

a two-prong analysis.  First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory.  *Id.* at 680.  Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief."  *Id.* at 681.  If the allegations state a plausible claim for relief, such claim survives the motion to dismiss.  *Id.* at 679.

Plausibility refers "'to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'"  *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)).  "The nature and specificity of the allegations required to state a plausible claim will vary based on context."  *Kansas Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011).  Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff has set forth a plausible claim.  *Khalik*, 671 F.3d at 1192.  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'"  *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Iqbal*, 556 U.S. at 679.  "[W]here the well-pleaded facts do not permit the court to infer more than the

mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

## ANALYSIS

As mentioned above, Plaintiffs assert seven claims.  Defendants argue all claims should be dismissed.  I address the Defendants' arguments for immunity under Section 230 and failure to state a claim under Colorado statutory and common law as follows.

I.     **The Communications Decency Act ("CDA")**

In general, Section 230 of the CDA "'immunizes providers of interactive computer services against liability arising from content created by third parties.'" *Does 1-6 v. Reddit, Inc*., No. 21-56293, 2022 WL 13743458, at *3 (9th Cir. Oct. 24, 2022) (quoting *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc)). It "protects websites from liability for material posted on the website by someone else." *Doe v. Internet Brands, Inc*., 824 F.3d 846, 850 (9th Cir. 2016). The Tenth Circuit has stated that "[t]he CDA is intended to facilitate the use and development of the Internet by providing certain services an immunity from civil liability arising from content provided by others." *F.T.C. v. Accusearch Inc*., 570 F.3d 1187, 1195 (10th Cir. 2009).  Passage of the CDA was a reaction to a state-court decision, *Stratton Oakmont, Inc. v. Prodigy Servs. Co*., 1995 WL 323710, *5 (N.Y. Sup. Ct. May 24, 1995), which held that "the provider of an online messaging board could be liable for defamatory statements posted by third-party users of the board." *Accusearch Inc*., 570 F.3d at 1195.

The CDA states first that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). Most important, the law provides that "[n]o cause of action may

be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). Therefore, a company such as Letgo is immune under the CDA if (1) it is a provider of an interactive computer service, (2) alleged liability is based on the defendant having acted as a "publisher or speaker," and (3) information is provided by another "information content provider." *Accusearch Inc.*, 570 F.3d at 1196.

Letgo is undoubtedly an interactive computer service. *E.g.*, *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 965 (N.D. Ill. 2009) (finding Craiglist provides an interactive computer service under the CSA); *Hinton v. Amazon.com.dedc, LLC*, 72 F. Supp. 3d 685, 690 (S.D. Miss. 2014) (same as to eBay). Plaintiffs do not challenge this. They do challenge whether they are bringing this action based on Letgo being a publisher or speaker, and whether their causes of action necessarily implicate content generated solely by "another" (in this case, Brown).

A.    Was Letgo Acting as a Publisher or Speaker?

There seems to be some redundancy between the second and third elements required for CDA immunity. For purposes of the present motion, I find that Defendants' potential liability is premised on their having acted as either a publisher or speaker, so the second element is satisfied.

From cases interpreting the CDA, it appears that any claim relying on an internet platform's "exercise of its editorial and self-regulatory function" is barred. *Ben Ezra, Weinstein, & Co., Inc. v. Am. Online Inc.*, 206 F.3d 980, 986 (10th Cir. 2000). In other words, "[i]mposing liability on Defendant for the allegedly [improper information] provided by [a user] would 'treat' Defendant as the 'publisher or speaker,' a result § 230 specifically proscribes." *Id.*

The facts of this case are materially like *Doe v. MySpace, Inc.*, 528 F.3d 413, 419 (5th Cir. 2008). There, the court cited with approval the following analysis of the district court:

> It is quite obvious the underlying basis of Plaintiffs' claims is that, through postings on MySpace, Pete Solis and Julie Doe met and exchanged personal information which

eventually led to an in-person meeting and the sexual assault of Julie Doe. If MySpace had not published communications between Julie Doe and Solis, including personal contact information, Plaintiffs assert they never would have met and the sexual assault never would have occurred. No matter how artfully Plaintiffs seek to plead their claims, the Court views Plaintiffs' claims as directed toward MySpace in its publishing, editorial, and/or screening capacities.

*Id.* at 419–20 (quoting lower court opinion, 474 F. Supp. 2d 843, 849 (W.D. Tex. 2007)). Plaintiffs' claims here attempt to reach Letgo in the same manner. It is clear to me that Plaintiffs' claims arise from content Brown provided, including his false name, the working telephone number, and his purported desire to sell a car. Those claims -- seeking to hold Letgo responsible for failing to adequately verify the content that was in Brown's advertisement --are expressly precluded under the *Doe v. MySpace* analysis. In that case, MySpace had a requirement that users of the platform be at least fourteen years old. *Id.* at 416. However, a thirteen-year-old female lied about her age and gained access to the platform. *Id.* Through that access she was lured into meeting a nineteen-year-old male, who sexually assaulted her. *Id.* The plaintiffs alleged "that MySpace failed to implement basic safety measures to prevent sexual predators from communicating with minors on its Web site." *Id.* As noted above, the court ruled that in fact, plaintiffs were treating MySpace as the publisher or speaker. Plaintiffs' claims here assert Defendants did not adequately engage in verification of the genuineness of a seller's advertisement nor his or her intentions. *See* Am. Compl. at ¶¶ 74, 82. As the *Doe v. MySpace* district court stated: "To the extent Plaintiffs seek to hold MySpace liable for ineffective security measures and/or policies relating to age verification, the Court . . . finds such claims are barred under [the CDA]." 474 F. Supp. 2d at 850. The same is true under the present facts insofar as the "publisher or speaker" element is concerned.

The critical issue is not what types of legal theories Plaintiffs assert, but rather, whether their claims ultimately rely on Defendants as the speaker. "[W]hat matters is not the name of the cause of action—defamation versus negligence versus intentional infliction of emotional

distress—what matters is whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of content provided by another." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1101 (9th Cir. 2009).

In my opinion, the real battle here lies in whether Brown was the *sole* content provider of the content on which Plaintiffs' claims are based, and I proceed to address that below.

B.        Was the Information Provided by Another "Information Content Provider"?

Because Plaintiffs cannot avoid Section 230 immunity with a claim that Letgo failed to properly verify the information on which the Rolands relied in being lured into Brown's scheme, they instead focus on Letgo's designation concerning the "verified" nature of the persons who sell items on the platform, attempting to base their claim on content provided by the Defendants. Plaintiffs argue, for example, that the "verified" tag is Defendants' representation that the seller is "reputable," or that the tag means the goods offered for sale are not stolen. Resp. at 4.

Defendants argue that the term "verified" as used on the platform "is the product of Brown 'simply providing' a name and working telephone number." Mot. at 14 (quoting Am. Compl. ¶ 29). Thus, they posit, user "verification" is again purely user-generated information. I do not entirely agree, because the "verified" designation was not "provided by" Brown.

The CDA defines the term "information content provider" as "any person or entity that is responsible, in whole or in part, for the *creation or development* of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3) (emphasis added). Under the analysis in *Accusearch Inc.*, a case relied on almost exclusively by Plaintiffs, "an interactive computer service that is also an 'information content provider' of certain content is not immune from liability arising from publication of that content." 570 F.3d at 1197. That court reasoned that information on an internet platform may have multiple contributors: "[T]here may

be several information content providers with respect to a single item of information (each being 'responsible,' at least 'in part,' for its 'creation or development')." *Id.*

The singular item of information relevant here is the "verified" designation, and factually, it appears to be a product of input from both Letgo and its users. It seems from the record that simply providing a telephone number to Letgo is not sufficient to earn the "verified" designation. At oral argument, Defendants acknowledged that when someone wants to create an account, he must provide, in this case, a functioning telephone number, whereupon Letgo sends a communication to that telephone number (an SMS text) to confirm that it really exists, then informs users that the person offering something for sale has gone through at least some modicum of verification. Thus, the argument can be made that Plaintiffs' claims do not rely solely on third-party content.

Defendants say Letgo merely created a forum for users to develop and exchange their own information, and the "verified" designation, relying solely on the existence of a working email address or telephone number, did not transform Letgo into a content provider. Mot. at 14. "If [a website] passively displays content that is created entirely by third parties, then it is only a service provider with respect to that content. But as to content that it creates itself . . . the website is also a content provider." *Roommates.Com, LLC*, 521 F.3d at 1162. I do not find in the existing caselaw any easy answer.

In *Accusearch Inc.*, the court found the defendant "developed" (as opposed to created, which is more relevant to the present action) the information at issue. 570 F.3d at 1198. The facts of that case are as follows. When someone using Accusearch's platform made a request for information, Accusearch forwarded the request to a paid third-party researcher, who then sent the search results to Accusearch, which in turn provided the information back to the requesting party.

*Id.* at 1191, 1199. Such information included confidential telephone information, the provision of which was illegal under the Telecommunications Act, 47 U.S.C. § 222(c)-(d). *Id.* at 1192. Accusearch claimed it was merely a pass-through for the information. *Id.* at 1197. The court found that "when confidential telephone information was exposed to public view through [Accusearch's platform], that information was 'developed' [or] ma[d]e actually available or usable." *Id.* at 1198. It was Accusearch's gathering, organizing, and providing information in response to specific customer requests that made them an information "developer." While those are different facts than the present case, where the theory relies on Defendants having "created" the information, *see Accusearch Inc.*, 570 F.3d at 1198 (explaining that under a long-standing canon of statutory interpretation, the terms "created" and "developed" must mean something different); *Shiamili v. Real Est. Grp. of New York, Inc.*, 17 N.Y.3d 281, 292, 952 N.E.2d 1011, 1019 (2011) (distinguishing *Accusearch Inc.* on that basis), the court's analysis concerning the proposition that a platform's content may have more than one provider supports Plaintiffs' argument against immunity here.

In *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265-66 (9th Cir. 2016), the plaintiff alleged that Yelp transformed negative reviews to conform to its star-rating system and, thus, "created" the information. The star-rating system was obviously a feature that Yelp (and not a user) created. Yet, the court found that Yelp had immunity in that situation. *Id.* at 1270. More specifically, the court found that when inputs from third parties result in a platform reducing the information "into a single, aggregate metric [that] is [nothing] other than user-generated data," immunity under the CDA applies. *Id.* "Indeed, the star-rating system is best characterized as the kind of 'neutral tool[ ]' operating on 'voluntary inputs' that we determined did not amount to content development or creation in [*Roommates.Com, LLC*, 521 F.3d at 1172]." *Id.* The court stated that "a website may

lose immunity under the CDA by making a *material* contribution to the creation or development of content." *Id.* at 1269 (emphasis added). In so holding, the court relied on its prior decision in *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119 (9th Cir. 2003), in which the court held that the mere fact that an interactive computer service "classifies user characteristics . . . and collects responses to . . . questions . . . does not transform [it] into a developer of the underlying misinformation." *Id.* at 1124. This holding appears to be at odds with *Accusearch Inc.* These cases appear to be adding requirements such as "materiality" and "neutral tool" that do not appear in the plain language of the statute.

In the same vein, again within the Ninth Circuit, a "verification" designation was considered a neutral tool functioning through voluntary inputs by a user and, thus, not content developed or created by the platform. *See Ripple Labs Inc. v. YouTube LLC*, No. 20-CV-02747-LB, 2020 WL 6822891, at *6 (N.D. Cal. Nov. 20, 2020) (holding that Youtube's practice of providing a "verification badge" "did not materially contribute to the content's illegality," but rather, the content was harmful because of the acts of third-party wrongdoers).

But in *Hiam v. HomeAway.com, Inc.*, 267 F. Supp. 3d 338, 346 (D. Mass. 2017), *aff'd on other grounds*, 887 F.3d 542 (1st Cir. 2018), the district court did not grant CDA immunity on the plaintiff's fraud and misrepresentation claims, relying on the allegation that the platform "undertakes some measure of verification for each posting," which the court viewed as implicating platform-authored content. The court did grant summary judgment on other grounds, namely, the failure to meet the elements of the common law claims and, incidentally, claims under the Colorado Consumer Protection Act (CCPA). *Id.* at 355, 357.

In the final analysis under the CDA, I find under *Accusearch Inc.* that Plaintiffs have sufficiently pleaded, for a motion under Rule 12(b)(6), that Defendants contributed in part to the

allegedly offending "verified" representation. Therefore, as this stage in the case, Defendants are not entitled to immunity under the statute. Whether this claim could withstand a motion for summary judgment, of course, is not before me.

## II.    Failure to State a Claim Under Common Law/State Law Theories

Plaintiffs have not cited a single case in which a court held an internet platform potentially liable for violent criminal acts perpetrated by a platform user who lured an innocent consumer into a scheme through means of misrepresentations made by the criminal. It would be too much of a stretch under their tort and CCPA theories to do so here, for the following reasons.

### A.    Simple or Gross Negligence

In Colorado, to establish a claim of negligence, a plaintiff must demonstrate the following elements: "(1) the existence of a legal duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was injured; and (4) the defendant's breach of duty caused the injury." *Dolan v. Contemporary Fin. Solutions, Inc*., 622 F. Supp. 2d 1077, 1082 (D. Colo. 2009) (quoting *Raleigh v. Performance Plumbing and Heating, Inc*., 130 P.3d 1011, 1015 (Colo. 2006)). The tort of gross negligence requires willful and wanton conduct. *See, e.g*., *Hamill v. Cheley Colo. Camps, Inc*., 262 P.3d 945, 954 (Colo. App. 2011*); Forman v. Brown*, 944 P.2d 559, 564 (Colo. App. 1996). Gross negligence is "'action committed recklessly, with conscious disregard for the safety of others.'" *Gilbert v. United States Olympic Comm*., 423 F. Supp. 3d 1112, 1149 (D. Colo. 2019).

Because, as noted above, Plaintiffs' claims involve Defendants' failure to protect the Rolands from Brown's criminal acts, this is a case of a failure to act, or "nonfeasance." "[I]n a nonfeasance case, the existence of a duty has been recognized primarily in cases involving a limited group of special relationships between the parties." *Rocky Mountain Planned Parenthood, Inc. v. Wagner*, 467 P.3d 287, 295 (Colo. 2020). The Colorado Supreme Court further stated: "To

date, we have recognized only the following special relationships: (1) common carrier/passenger; (2) innkeeper/guest; (3) possessor of land/invited entrant; (4) employer/employee; (5) parent/child; and (6) hospital/patient. . . . Absent such a special relationship, we have generally declined to impose a duty of care in cases involving a defendant's nonfeasance." *Id.* (citations omitted). Because use of an online platform does not implicate any of these relationships, Plaintiffs cannot assert a negligence claim. This also eliminates a claim for gross negligence but, in any event, I cannot Plaintiffs have pleaded willful or wanton conduct on this record.

Plaintiffs' claims also fail at the causation element. As Defendants note, causation involves both a "but for" component and the concept of proximate cause, *i.e.*, was the ultimate harm reasonably foreseeable. *Id.* at 292-93. I find that no reasonable jury could conclude Defendants were the "predominant cause" (*see id.*) of the Rolands' deaths. Under any analysis, the predominant and intervening cause was Brown's independent actions.

B.    Fraud or Negligent Misrepresentation

The only possible representation made by Defendants in this case is that Brown verified his account with an actual phone number. That is true. Other than this fact, it would be pure speculation as to what that term "Verified with [phone number]" meant to the Rolands. Plaintiffs have alleged no representations that were objectively false or misleading. Furthermore:

> A plaintiff asserting a fraud claim must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). Under Rule 9(b), the plaintiff 'must state with particularity the circumstances constituting fraud or mistake.' Fed. R. Civ. P. 9(b). We have interpreted this Rule to require a plaintiff to 'set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'

*Li v. Colorado Reg'l Ctr. I, LLC*, No. 21-1232, 2022 WL 5320135, at *13 (10th Cir. Oct. 7, 2022) (citation omitted). The Amended Complaint does not meet this standard.

C.    Colorado Consumer Protection Act (CCPA)

The CCPA forbids deceptive trade practices. "To be a deceptive trade practice under the CCPA, 'a false or misleading statement' must be made 'with knowledge of its untruth, or recklessly and willfully made without regard to its consequences, and with an intent to mislead and deceive the plaintiff.' . . . A material omission is a deceptive trade practice if the defendant failed to 'disclose material information . . . which information was known at the time of an advertisement or sale if such failure to disclose such information was intended to induce the consumer to enter into a transaction.'" *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1120–21 (10th Cir. 2008) (citing Colo. Rev. Stat. § 6–1–105(1)(u)). Plaintiffs' Amended Complaint does not allege these elements with any factual support. Specifically, Plaintiffs do not sufficiently allege that Defendants misrepresented what their verification process entailed. It is clear from the record that there is no factual basis for alleging that Letgo *knew* anything in the Brown ad was a lie, or that it acted recklessly or willfully, intending to induce the Rolands to transact with Brown. I reach this conclusion without even applying the Rule 9(b) heightened pleading standard, which does apply to CCPA claims. *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011).

D.    Wrongful Death and Loss of Consortium

In Colorado, a wrongful death action is "derivative and allows recovery of only the monetary losses sustained by certain surviving relatives of a decedent." *DeCicco v. Trinidad Area Health Ass'n*, 573 P.2d 559, 562 (Colo. App. 1977). Because Plaintiff alleges no tortious acts for which they can recover damages, this claim fails. This is true for the loss of consortium claim as well. *Lee v. Colorado Dep't of Health*, 718 P.2d 221, 230 (Colo. 1986) ("[A] claim for loss of consortium [is] considered collateral or derivative to the personal injury claim . . . .").

## **CONCLUSION**

"Litigants are permitted to make good-faith arguments for the extension, reversal, or modification of existing law." *United States v. Flores*, 817 F. App'x 558, 560 (10th Cir. 2020). Plaintiffs have done so here, understandably so. I have been cognizant of my obligation to determine whether, under the facts alleged in the Amended Complaint, read broadly and plausibly, a case could be made for proceeding to discovery. I cannot find such a case here, despite the horrific outcome of the facts. Because the Court sees no plausible claim even after taking an expansive view of the pleadings, it would be futile to grant Plaintiffs leave to amend. *Curley v. Perry*, 246 F.3d 1278, 1281–82 (10th Cir. 2001); *Fleming v. Coulter*, 573 F. App'x 765, 769 (10th Cir. 2014).

Therefore, Defendants' Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) [filed June 17, 2022; ECF 20] is **granted**. The Clerk of the Court is directed to close this case.

Respectfully submitted this 5th day of December, at Denver, Colorado.

BY THE COURT:

Michael E. Hegarty
United States Magistrate Judge

16